U.S. DEPARTMENT OF JUSTICE
UNITED STATES MARSHALS SERVICE

REPORT OF INVESTIGATION

Lawanda Hewitt

Docket Number: USM-2015-01914

This Equal Employment Opportunity (EEO) investigation file contains identifiable
personal data that is subject to the Privacy Act of 1974, 5 U.S.C. 552a.  Release of such data
must be in accordance with the provisions of that Act, as amended.  The unauthorized
release of this information could subject the releaser to formal disciplinary action and/or
criminal penalties, including fines of up to $5000.00.


GOVERNMENT
EXHIBIT
A

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

II.     The Investigation

    A.     Investigator Assigned:

        Robert Wesley
        Office of Equal Employment Opportunity
        United States Marshals Service
        1251 NW Briarcliff Parkway, Suite 300
        Kansas City, Missouri 64116

    B.     Date Case Received for Investigation:

        December 16, 2015

    C.     Investigation Dates:

        January 4, 2016 through March 23, 2016

    D.     Place of Investigation:

        Kansas City, Missouri via telephone interviews

III.    Issue in Complaint:

        Whether Complainant was subjected to disparate treatment/harassment based on sex (female). Examples over the past year include, but are not limited to, the following:

- On June 16, 2015, the Warrants supervisor wrote negative comments in Complainant's mid-year evaluation concerning her timeliness;
- On April 30, 2015, the Warrants supervisor sent Complainant a threatening email questioning her timeliness on an assigned warrant. Complainant further alleges that this incident was the most recent example of the Warrant supervisor's micro-management of her assignments as compared to the male deputies; and
- The Warrants supervisor has singled Complainant out and belittled and humiliated her in front of her co-workers.

Management's Response:

        Management states they did not discriminate against Complainant on the basis of sex.

2

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

IV.    Remedy Sought by Complainant:

        1. That SDUSM Eversman be fired or, at the minimum, be formally reprimanded or demoted.

        2. A permanent position as an Inspector working warrants at the Gulf Coast Regional Fugitive Task Force (GCRFTF).

V.                                                   Summary[1]

    **Example 1:**   On June 16, 2015, the Warrants supervisor wrote negative comments in Complainant's mid-year evaluation concerning her timeliness

### *Complainant's Testimony*

*In her sworn affidavit (Exhibit 9), Complainant provides the following testimony:*

**Lawanda Hewitt (female),** hereafter referred to as "Complainant," states that her chain of command consisted of two Supervisory Deputy U.S. Marshals (SDUSMs), a Chief Deputy U.S. Marshal (CDUSM), and a U.S. Marshal (USM). She added that she was usually supervised by the Court Operations supervisor, SDUSM Dwayne Guida (who retired on June 15, 2015); however, SDUSM Edward Eversman was her supervisor anytime she worked warrants, which was continuous, and/or when she had training.

Complainant states SDUSM Eversman wrote in the Performance Rating Narrative under Critical Element (CE) #5 - *Investigation*, that "DUSM Hewitt did the minimum amount of effort to complete her assigned investigations in a successful manner. DUSM Hewitt would benefit from implementing better time management skills as her assigned warrants often get tabled to pursue other endeavors and sometimes fail to get worked in a timely manner."

When asked why she felt these comments were negative, Complainant indicates she examined the spreadsheet on the shared drive that SDUSM Eversman created to keep track of all the assigned warrants, and she determined that most are cleared in 30 days or less. She indicates that her analysis showed she had the least number of warrants (3) that were outstanding for longer than 30 days as compared to DUSM Garrett who had 14 outstanding warrants. Complainant adds that, in an effort to get a more accurate

---

[1] The following summaries of the affidavits and interrogatories contain information provided by the respective affiants. The information in the summaries may be found in each of the respective affiants' affidavits or interrogatories attached hereto as exhibits. The summaries are not a finding of fact or conclusion made by the EEO Investigator, but rather a narrative of the information contained in the respective affidavits and interrogatories. The questions utilized to obtain testimony during the investigative process were used to gather evidence and do not constitute a finding of fact or conclusion by the EEO Investigator.

3

## U.S. DEPARTMENT OF JUSTICE
## UNITED STATES MARSHALS SERVICE

### REPORT OF INVESTIGATION
### (DOCKET NO. USM-2015-01914)

**Discrimination Complaint**
**of**
**Lawanda Hewitt**

I.   The Complaint

A.   Complainant's Position:

Deputy U.S. Marshal (DUSM)

B.   Location Involved:

United States Marshals Service (USMS)
Southern District of Alabama (S/AL)

C.   Nature of Action Giving Rise to Complaint:

Disparate treatment/harassment

D.   Date of Alleged Discrimination:

April 30, 2015

E.   Kind of Discrimination Alleged:

Sex (Female)

F.   Date of Formal Complaint:

July 20, 2015

G.   Responsible Management Official (RMO):

Edward Eversman, Supervisory Deputy U.S. Marshal (SDUSM)
Southern District of Alabama (S/AL)

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

comparison, she examined who had the same amount of warrants as she had and it was determined that she had 28 warrants and DUSM Brown had 27. Complainant states her analysis showed that, of her three warrants that took longer than 30 days to clear, the breakdown on each warrant was 69 days, 48 days, and 49 days, respectively. She indicates that, of DUSM Brown's seven warrants that took longer than 30 days to clear, his breakdown was 53 days, 180 days, 79 days, 59 days, 36 days, 68 days, and 265 days, respectively. Complainant believes the facts listed in SDUSM Eversman's own spreadsheet clearly do not back up the statements made in her mid-year evaluation. She adds that, in the past years, each deputy has been given cash awards and time off awards based on the annual performance evaluation. Complainant contends that SDUSM Eversman's reason for giving her a mark of a "3" (Successful) under Critical Element #5 - *Investigation* (stating her warrants fail to get worked in a "timely manner") was unjust and without merit, and she adds that on the same evaluation, she received a mark of a "4" or "Outstanding" in the category of "Time Management." Complainant further maintains that SDUSM Eversman's spreadsheet clearly shows she had the best clearance rate out of all the deputies in the office. Complainant asserts she forwarded the spreadsheet to district management; however, she did not receive a response from anyone.

Complainant offers another example of SDUSM Eversman's treatment towards her after she received a response on May 20, 2015, from Chief Vernon Johnson in connection with an informal grievance that she filed. She indicates Court Security Officer (CSO) Connie King advised Complainant that SDUSM Eversman later interrogated her about her talking to Complainant because he thought CSO King had been giving Complainant advice or guidance on her grievance. Complainant contends CSO King advised her that SDUSM Eversman hovered over her in a very threatening and intimidating manner, so close that CSO King could not stand up, and began questioning her involvement.

Complainant offers that on June 9, 2015, she received the response to her Formal Grievance and it stated, in part, that the district would be swapping SOIC Sean Carney and SDUSM Eversman's duties, and that the "non-intended result of these reassignments is that SDUSM Eversman will have no supervisory responsibilities over Complainant and their interactions will be limited." Complainant agrees that their interaction has been limited; however, there have still been times that SDUSM Eversman was designated as the "Acting Chief" when Chief Johnson was out of the office.

### *Witness Testimony*

**Connie King (female)** is a Court Security Officer (CSO) for AKAL Security. On May 21, 2015, she was assigned to the parking garage on the second floor at the Judicial Parking Area.

4

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

*In her sworn affidavit (Exhibit 12), Connie King provides the following testimony:*

CSO King states that on May 21, 2015, SDUSM Eversman approached her in the parking garage and advised her that he had spoken with the Chief about her possible involvement in Complainant's complaint against him. CSO King further adds that SDUSM Eversman advised her that he had some questions he wanted answered, and that he was concerned about having animosity towards her while attempting to work with her and everything would depend on how she answered his questions. She explains SDUSM Eversman wanted to know if Complainant had shown her an email, whether or not she advised Complainant to file a complaint against him and/or helped Complainant to write or edit a complaint filed against him. CSO King states she answered "no" to all of his questions in an attempt to appease him so he would leave. She states SDUSM Eversman advised her that Complainant had named her in the complaint as a witness. She adds she felt uncomfortable answering these questions in a parking garage after business hours and, further, that SDUSM Eversman was a friend of her supervisor, Mike Hulack, and they socialize once a week. CSO King states after SDUSM Eversman left, she called Complainant and asked her if she named her in the complaint and relayed what had happened in the garage. She indicates Complainant asked her to call the Chief and inform him of the incident to which she did, and the Chief asked her to write a statement.

### Management Testimony

**Edward Eversman (male)** is a Senior Inspector and has served as the Sex Offender Investigations Coordinator (SOIC) since July 2015. At the time of Complainant's allegations, he was the Warrants Supervisory Deputy (January 2011 until July 2015).

*In his sworn affidavit (Exhibit 23), Edward Eversman provides the following testimony:*

SDUSM Eversman[2] states Complainant's overall performance evaluation was written by the Operations supervisor, SDUSM Dwayne Guida; however, SDUSM Eversman provided the evaluation for the *Investigations* portion of all the deputies, for which SDUSM Guida copied the comments and rating into the actual evaluation document. SDUSM Eversman states he explained many times to deputies who did not agree with his ratings that the ratings are based on their performance, and that if their performance did not merit a higher evaluation, then they did not get it. SDUSM Eversman explains that he discussed with (now retired) Chief Marcia Lewis the possibility of placing Complainant on a Performance Improvement Plan (PIP) during previous rating years due to Complainant's lack of performance in investigations, but Chief Lewis repeatedly denied doing so. SDUSM Eversman states that, during several Class I warrants[3] he

---

2  Although Edward Eversman was the SOIC at the time he executed his affidavit, he is referred to throughout the summary as SDUSM Eversman as that was his position at the time of the allegations in the complaint.
3  SDUSM Eversman identified these warrants as those that are scrutinized by top management.

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

assigned to Complainant, she failed to perform even the basic investigative efforts and he had to verbally counsel her several times during the pendency of those cases to either begin or continue with the investigation. He maintains Complainant frequently made excuses for not having the time to process her warrants and, as a result, he would discuss this with her Operations supervisor and Warrant Coordinator so they could clear Complainant's schedule; however, she would still not work her warrants, but would work collateral and other duties. SDUSM Eversman stated that although Complainant received a rating of "4" in the category of *Time Management*, his comment on the investigative portion of her evaluation was in response to her excuses that she never had the time to do the investigations as required, even when provided ample time for her to do so. He adds that he was well aware of Complainant's "17 years of investigative experience" in her previous jobs as a police officer, but he always based his evaluations on her current performance -- not her past history.

Concerning the incident involving CSO Connie King, SDUSM Eversman states the meeting actually took place on or about April 29, 2015. He indicates he heard rumors that Complainant was planning to file an informal grievance and, further, that she had shown the email (listing the things he wanted her to accomplish involving her warrants) to CSO King. SDUSM Eversman says he contacted CSO King in the parking garage as he was leaving, asked her several questions about her conversation with Complainant, that the tone of the conversation was very cordial - not interrogatory, and he left with no indication that CSO King felt threatened in any way.

**Sean Carney (male)** is Supervisory Deputy United States Marshal (SDUSM).

*In his sworn affidavit (Exhibit 20), Sean Carney provides the following testimony:*

SDUSM Carney recalls the email from Complainant on June 18, 2015 and states he had little insight into the content. He explains he does not recall ever seeing the spreadsheet in question and adds that Complainant discussed the issue outlined in the email with him, and he thought her issue had merit as she explained it. SDUSM Carney states he was unaware of any action management took as a result of the email.

**Vernon Johnson (male)** is the Chief Deputy United States Marshal (CDUSM).

*In his sworn affidavits (Exhibit 21), Vernon Johnson provides the following testimony:*

CDUSM Johnson states that SDUSM Dwayne Guida was the Operations supervisor, as well as Complainant's rater of record, and SDUSM Eversman provided input as the Warrants supervisor.

6

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

CDUSM Johnson states, generally, he recalls SDUSM Eversman coming to his office on April 28, 2015, and considered it a mentoring session. He says SDUSM Eversman wanted advice on how to deal with Complainant not completing her work assignments in a timely manner. CDUSM Johnson states the advised SDUSM Eversman to make a detailed list of what he required, with timelines for completion, and to give it to Complainant in person. He adds that he also discussed about differentiating between whether the problems Complainant was having were performance or conduct based, and that discipline could be a tool if the problems were based on conduct.

CDUSM Johnson states he recalled directing CSO King to provide him with a written statement, to which she complied. Further, he met with CSO King and informed her that he would advise SDUSM Eversman to only address CSO King if it was operationally necessary. He adds that the Marshal and he also discussed this incident with CSO Supervisor Mike Hulak, particularly about CSO King's concern of his friendship with SDUSM Eversman outside of the office, and advised him that any reprisal towards CSO King for any reason would not be tolerated.

With regard to Complainant's concern about CDUSM Johnson assigning SDUSM Eversman as the Acting Chief on several occasions during his absence, CDUSM Johnson states that SDUSM Eversman is still a member of the district's management and that he rotates the acting responsibility between his operational direct reports, which includes Eversman.

CDUSM Johnson maintains that, after receiving the email about the spreadsheet from Complainant, he discussed it with SDUSM Guida and was advised that it was some type of in-house warrant tracking tool created by SDUSM Eversman. He also states SDUSM Eversman advised him the spreadsheet was being used as part of the mid-year appraisals. CDUSM Johnson says he had no knowledge of the spreadsheet up until this point in time.

Concerning Complainant's performance award, CDUSM Johnson states he discussed Complainant's performance with SDUSM Guida and then made a recommendation to the Marshal as to what amount Complainant and others should receive.

**Example 2:** On April 30, 2015, the Warrants supervisor sent Complainant a threatening email questioning her timeliness on an assigned warrant. Complainant further alleges that this incident was the most recent example of the Warrant supervisor's micro-management of her assignments as compared to the male deputies;

7

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

**Complainant** states this incident actually began on April 9, 2015, when SDUSM Eversman stopped by her desk inquiring about the status of the warrant he had assigned her a few days earlier. Complainant maintains she advised him she had not done much because she had been on approved leave and that, since returning, she had been handling collateral duties involving property because they had two deputies (Manley and Jones) transferring out; she explains he had been splitting her time between the court and cellblock duties and handling Manley and Jones' assigned property. Complainant contends SDUSM Eversman later called her to his office and began asking her questions from a checklist concerning what she had done on the warrant. She says she tried responding to his questions, which were asked at a fast pace, but he just continued going down the checklist. Complainant asserts she mentioned SDUSM Eversman's conversation and checklist to SDUSM Guida who told her he would talk to Eversman and try to get him to not hold the prior three weeks of Complainant's collateral duties activity against her for not processing the warrant. Complainant maintains that, two weeks later, on April 29, 2015, she received the email from SDUSM Eversman criticizing her performance on the processing of her warrants.

Complainant contends that after initially receiving SDUSM Eversman's email on April 30, 2015, she forwarded it to several deputies (Marcus Malone, Jim Glisson, Michael Clemmons, Jordan Futo, Will McAdams, Josh Devine, Scott Page, and Oscar Torres) asking if they have ever been given a similar checklist. She indicates they all told her they had never seen anything like it and more than one suggested she should file a grievance because it was obvious SDUSM Eversman had personal issues with her. Complainant adds that SDUSM Eversman assigned her another warrant during this time period, and she received another email from him containing a long checklist of things he specifically wanted done on the warrant, as well as giving her a deadline to provide him this information. (Exhibit 9)

*Witness Testimony*

**DUSMs Marcus Malone, William McAdam, Josh Devine, Ross Manley, and Oscar Torres (males)** all state they were never given a warrant checklist by SDUSM Edward Eversman. (Exhibits 16, 15, 10, 17 and 19, respectively)

**DUSM Eric McCain (male)** states he received periodic emails from SDUSM Eversman as reminders of how he wanted the warrants worked and how he wanted the report structured. DUSM McCain adds that he met with SDUSM Eversman every three to six months for reviews on the status of his cases. (Exhibit 18)

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

**DUSM Jim Glisson (male)** recalls that most of Complainant's cases were cleared in a short time, and he felt SDUSM Eversman was singling Complainant out due to her gender or for not being "one of the cool kids." He adds that, from what he could discern from the JDIS closed case list, Complainant had one of the highest case clearance rates in the district. (Exhibit 11)

*Management Testimony*

*In his sworn affidavit (Exhibit 22)*, **United States Marshal (USM) Charles Andrews (male)** states he had no specific recollection of the email; however, he recalled being briefed on the mid-year performance appraisal by CDUSM Johnson. USM Andrews adds that he received periodic updates from district managers and did not dictate how they assembled or provided the information.

USM Andrews explains that CDUSM Johnson informed him about SDUSM Eversman using the spreadsheet as a tool to enable him to track the status of warrants assigned to the deputies. He further explains that CDUSM Johnson discussed this matter with Complainant and SDUSMs Eversman and Guida, and advised them he would participate in a monthly review of all assigned district warrants to address any issues or concerns.

In response to Complainant's allegation of disparate treatment as far back as 2011 due to her sex, including some incidents that had been brought to the attention of former CDUSM Marcia Lewis, USM Andrews asserts CDUSM Lewis never provided him any of this information.

*In his sworn affidavit (Exhibit 24)*, **Acting SDUSM Tim Garrett (male)** states that Complainant asked him what investigative database queries he performed when conducting a fugitive investigation, and he cited numerous queries and advised her that some vary depending on the fugitive. He further adds Complainant asked him if he had ever been given a checklist for conducting fugitive investigations and he stated he had not. SDUSM Garret says SDUSM Eversman monitored his warrants by conducting a warrant review as well as in general conversation during investigative updates and strategies.

SDUSM Garrett asserts he made no statement to Complainant about SDUSM Eversman singling her out and treating her differently than the males. He adds that, from December 2013 to October 2015, he was assigned the collateral duty of Warrant Coordinator. He explains, during this time period, Complainant's approach to warrant activities was very apathetic and that she often made the comment, "I'll just wait until the locals pick them up."

9

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

**SDUSM Eversman** states he created the spreadsheet for his own use and for the Warrant Coordinator(s) to use in his absence. He adds that the spreadsheet was simply a basic go-by to monitor who a warrant was assigned to, the name of fugitive, the date received, the date assigned, and the date closed. He maintains the spreadsheet had no data about the case in chief, the investigative efforts or methods, or the reason for the cases being closed. SDUSM Eversman maintains he never used this spreadsheet as a metric for evaluating investigative performance.

SDUSM Eversman further states that, during the first week of April, he conducted a warrant review of all warrants assigned to the deputies, calling them into his office at several times, and going over each case. He explains he asked specific questions about their progress and offered guidance on how to proceed. He says when interviewing Complainant, he noticed that one of her Class I warrants had been assigned a month earlier and she had completed no investigative efforts on the case stating she did not have time. SDUSM Eversman states he admonished Complainant and advised her that she was expected to investigate all assigned cases in a timely manner. He says about two weeks later, he determined that no work had been done on the warrant, and he, again, admonished Complainant and told her she could use Law Enforcement Availability Pay (LEAP) time to work the warrant and he would not accept any more excuses.

SDUSM Eversman states on April 28, 2015, he observed the case file in question on Complainant's desk and, upon examination, he determined Complainant had made only one cursory database check and had made no entries on the USM-11c form as to her investigative efforts. He says he asked the Warrant Coordinator, DUSM Brown, if he believed Complainant had sufficient time to work the warrant to which DUSM Brown stated she did. SDUSM Eversman states, at that time, he decided to contact CDUSM Johnson about the issues he was having with Complainant's performance. He described Complainant's performance problems and CDUSM Johnson advised him to create an investigative list of everything he wanted Complainant to perform, send it to her with a specific date of when it was to be completed and then have Complainant report to him in person to brief him on the results. SDUSM Eversman says CDUSM Johnson also advised him to notify Complainant that she would be referred for discipline if the tasks were not completed.

SDUSM Eversman states on April 29, 2015, he sent Complainant the email and copied CDUSM Johnson. SDUSM Eversman says he assigned another Class I warrant to Complainant on April 30, 2015, and sent her another email containing the same instructions. He reiterates that he monitored all the deputies' assigned warrants and Complainant was the only one that he gave a list of investigative tasks to perform because she had failed to properly process her warrants, had failed to follow his verbal instructions, and he had to proceed to written instructions as directed by CDUSM Johnson. (Exhibit 23)

10

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

**Example 3:** The Warrants supervisor has singled Complainant out and belittled and humiliated her in front of her co-workers.

Incident 1 –

**Complainant** says in the fall of 2011, SDUSM Eversman confronted her and began scolding her in front of other deputies for leaving the range during lunch, stating she disobeyed his orders and called her defiant. Complainant explains that she and several deputies (Malone, McAdam and Manley) had lunch at her brother-in-law's residence, which was close to the range, and they returned back to range on time. She says she reported this incident to her supervisor, Dwayne Guida, who told her he had reported the matter to former CDUSM Marcia Lewis who indicated that SDUSM Eversman could not order anyone where to have lunch. (Exhibit 9)

*Witness Testimony*

**DUSMs William McAdam and Ross Manley** state they were present during the incident where SDUSM Eversman confronted Complainant after they returned from lunch. DUSM McAdam explains SDUSM Eversman began counseling Complainant for leaving and then the conversation took a direction when he began calling her defiant. DUSM Manley recalls the conversation between Complainant and SDUSM Eversman did upset Complainant. **DUSM Marcus Malone** states he did not actually witness the exchange between SDUSM Eversman and Complainant as he had already begun shooting at the range. (Exhibits 15, 17 and 16, respectively)

*Management Testimony*

**SDUSM Carney** states he was not a party to the conversation that took place between Complainant and SDUSM Eversman, but Complainant discussed the matter with him after SDUSM Eversman had left the range. SDUSM Carney states he advised her to notify her supervisor, SDUSM Guida, and voice her concerns. (Exhibit 20)

**SDUSM Eversman** states he gave deputies specific instructions in an email that they were not authorized to leave the range for lunch, and they would need to bring their lunch and eat between training rotations. He says these instructions were based on the amount of training rotations they had in a short amount of time. SDUSM Eversman adds that after the deputies returned from lunch, he separately met with and admonished DUSMs Malone and McAdam, and that, later, he admonished Complainant when the other deputies were not present. He asserts Complainant became argumentative and defensive, at which time he advised her that she had disobeyed a direct order from her supervisor causing delays in training, and that she was now being insubordinate. (Exhibit 23)

11

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

Incident 2 –

**Complainant** states on or about Monday, April 1, 2013, the USMS answering service had trouble getting in touch with the on-call deputy, DUSM Eric McCain, and Complainant contacted them and assumed his call back duty; she says it was later determined that DUSM McCain had his phone on silent. Complainant indicates that, due to confusion regarding who actually had call back duty, the answering service contacted SDUSM Eversman. She maintains that, later, upon returning SDUSM Eversman's call, he began berating and screaming at her non-stop for up to 10 minutes and a friend of hers could hear this conversation. Complainant states after the conversation with SDUSM Eversman, she sent a text to SDUSM Guida requesting that she be removed from her six month warrant rotation under SDUSM Eversman and made a statement to SDUSM Guida that she had just gotten yelled at by SDUSM Eversman like she was his teenage daughter. Complainant says SDUSM Guida later advised her that he had discussed the matter with SDUSM Eversman. She adds that, upon returning to work, SDUSM Eversman advised her SDUSM Guida had shown him her text and that he was offended that she had made the comment about his teenage daughter at which time she advised him she was not speaking specifically about his daughter, but was speaking in general terms, and she apologized to him.

Complainant notes that both she and DUSM McCain did not initially answer their phones, yet DUSM McCain, who was the assigned duty deputy, said he was calmly told by SDUSM Eversman to be more aware and to not let it happen again while she got screamed at and threatened with being written up. (Exhibit 9)

*Witness Testimony*

**DUSM Eric McCain** states he did recall talking with SDUSM Eversman about this incident, and he did not recall SDUSM Eversman ever yelling at him. He states that SDUSM Eversman was very direct and blunt in his conversations with him.

*Management Testimony*

**SDUSM Eversman** states he recalled this incident and it involved a mix-up on who was actually the on-duty deputy. He states he received a call from the answering service on a Saturday morning at about 6:30am and was advised that they were unable to contact Complainant who was the on-duty deputy. SDUSM Eversman says he handled the matter and then tried several times to contact Complainant on her government-issued phone (without any success) leaving voicemails on each occasion. He states Complainant finally returned his call about 9:00pm that evening and advised him that she had just received his messages. SDUSM Eversman states they discussed the relevancy of a government-issued phone and Complainant advised him that she rarely carried or

12

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

checked that phone and that he should try to contact her on her personal phone to which SDUSM Eversman declined. SDUSM Eversman maintains the next Monday, he advised CDUSM Lewis about the incident and she told him that if Complainant did not want to carry or answer her government-issued phone when "off-duty," CDUSM Lewis could take away her government vehicle (GOV) and phone, as well as her LEAP pay. SDUSM Eversman states he then had a discussion with SDUSM Guida who informed him that Complainant had sent him numerous text messages about the situation and stated she felt like SDUSM Eversman had treated her like his teenage daughter. SDUSM Eversman states he became upset over that comment and felt it was improper for Complainant to use that analogy because Complainant was aware of personal issues he had had involving his daughter. SDUSM Eversman says he later discussed the answering service incident with DUSM McCain who apologized for the confusion. (Exhibit 23)

Incident 3 –

Complainant explains during the spring of 2013, while assigned to the task force and working a fugitive warrant, she received information from an officer in Fairhope advising her that the fugitive was in custody; she went to fax him the necessary paperwork. Complainant states that when she returned to her desk, she determined she had missed a call from SDUSM Eversman and his voicemail indicated his knowledge of the fugitive being in custody. Complainant states she did not call SDUSM Eversman back right away because she was making arrangements to get the fugitive transferred back to Mobile. She indicates that, during that period, SDUSM Eversman called her back and began lecturing and scolding her about not answering his call. Complainant asserts that, as a result of this incident, she later determined that after receiving her annual performance appraisal from SDUSM Guida, she received all "4s" and "5s" with the exception of a "3" in the category of *Investigations*. Complainant states she asked SDUSM Guida why she received a "3" in *Investigations* and was told it was SDUSM Eversman's decision as the Warrant supervisor, and further, that SDUSM Eversman had told him it was because Complainant did not answer his phone call. Complainant states that it should be noted that during this conversation with SDUSM Guida, he also said, "Don't take it personal Lawanda; Ed has a problem with females. Before you, it was Nicole, and before Nicole, it was Robin." (Exhibit 9)

*Management Testimony*

**SDUSM Eversman** states he had called Complainant on her government-issued phone about a work-related matter and left her a voicemail. He says she did not call him back until later in the afternoon at which time she again advised him that he should try to call her on her personal phone as she did not always have her government phone. SDUSM Eversman states this revelation blew him away since they had just had a conversation about a month or so earlier concerning the significance of the government phone.

13

USM000014

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

SDUSM Eversman maintains he again admonished Complainant about the phone issue. He adds that, during the rating submitted in July 2013, he commented that Complainant needed to work on her communication skills. (Exhibit 23)

Incident 4 –

**Complainant** indicates that, during the winter of 2013, the district had team leader tryouts for a position on the task force. She states that after all of the candidates received the grading criteria for the five categories, she was out sick and later discovered that SDUSM Eversman decided, at the last minute, to include another category of extra credit for pushups -- one point for every extra push up completed. Complainant explains she voiced her dissatisfaction with that decision because she would not be able to do as many pushups as any of the men. She asserts she was not selected for the position and, after discussing it with former CDUSM Lewis, she was told the extra credit for the pushups had not been the deciding factor for the person ultimately selected. (Exhibit 9)

*Management Testimony*

**USM Andrews** states that SDUSM Henry Geberth of the Gulf Coast Regional Fugitive Task Force (GCRFTF) requested a specific deputy in 2013; however, he was opposed to that and assigned the next deputy on the warrant rotation. Afterwards, SDUSM Geberth requested the district provide a deputy as Team Leader for one of the Task Force warrant teams, so USM Andrews directed SDUSMs Guida, Eversman, and Geberth to develop a selection process. That was done and, based upon the established criteria, a selection was made by CDUSM Lewis.

USM Andrews states Complainant did not mention the selection process to him until September 2014 when there was a new selection process. He stated, at that time, he advised her that his decision on selection was not going to be based exclusively on the firearms qualifications and the results of the FIT test, but also on the interview process, and that no one would be denied an interview. USM Andrews says this discussion turned out to be moot because the position was not filled in 2014, or afterwards, due to personnel reduction. He concludes that, since his arrival in the district, deputies have been made aware that he has an open door policy, that they can come to him if efforts to resolve at the lower levels fail, and that they are also aware that misconduct, malfeasance and/or discrimination of any kind will not be tolerated and will be addressed. (Exhibit 22)

**SDUSM Eversman** states that, in 2013, SDUSM Geberth requested the Team Leader positon and approached the Marshal about it, even submitting the names of three contenders. He says the Marshal recommended a competition style selection process and would make a selection. SDUSM Eversman explains that they developed a selection process; however, SDUSM Geberth saw flaws in the process as it related to the FIT

14

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

(fitness in total) test and suggested that extra points be awarded for push-ups and sit-ups beyond the maximum scored amount so that those who were truly determined to try the hardest would benefit. SDUSM Eversman says the Marshal agreed and directed him to implement the change, therefore, he put out an email to everyone who was participating to inform them of the change. He states Complainant notified him the day before the FIT test that she was sick and could not take the test; he says he advised her she could reschedule, but that Complainant withdrew and he did not hear anything else about this until more than nine months later. SDUSM Eversman states the Team Leader position was only to last for one year, and the Marshal wanted to have another competition for whoever was interested for the next rotation. (Exhibit 23)

Incident 5 –

Complainant states during the ice freeze in January 2014, SDUSM Eversman inquired about the status of a warrant he had assigned her about two weeks earlier. Complainant says she tried to explain the reasons she had not been able to work the warrant ( i.e., being on approved leave and later conducting a laptop inventory and preparing OSHA reports). She contends SDUSM Eversman would not let her talk, continued to talk over her, did not accept her reasons and told her she needed to get her priorities straight. Complainant asserts SDUSM Eversman purposely set unrealistic and impossible standards for her, but does not do this with male deputies. (Exhibit 9)

*Management Testimony*

SDUSM Eversman says that after everyone returned from the days off following the ice storm, he saw Complainant and asked her about the status of a warrant he had assigned to her a couple of weeks earlier. He states she immediately began with excuses about how she could not get to the warrant. He says he stopped her from continuing because he had heard her excuses so many times before, and he reminded her of her LEAP pay and obligations and told her to get the warrant started. SDUSM Eversman adds that every other deputy was able to continue their investigations in spite of the ice storm. (Exhibit 23)

Incident 6 –

Complainant contends that, due to being the only operational female in the office, it was more than ironic that she was the only one made to work the clerical/secretarial duties at the front desk after the criminal clerk, Stacy Leon, was relieved of her duties. She states CDUSM Lewis and SDUSM Guida asked her to work the front desk and told her it was going to be a 30-day rotation and that every deputy would have a turn at it; however, she contends that proved to be false. Complainant states she later asked SDUSM Guida about it, as he the Acting Chief at the time, and he stated it was because she was on light

15

EEO Investigation of Lawanda Hewitt, Docket No. USM-2015-01914

duty; however, she asserts she checked the records of those on light duty and determined that none of the six male deputies recently on light duty were ever made to sit at the secretary's desk nor assigned these duties. Complainant contends she has been treated as a secretary, even called a "deputary." (Exhibit 9)

*Witness Testimony*

DUSM William McAdam could not recall any male deputies being assigned to the front desk to perform clerical duties. (Exhibit 15)

DUSM Ross Manley did not recall Complainant being called a "deputary" and said, to his knowledge, the task was to be rotated amongst other deputies, but he did not recall if anyone else worked the assignment. (Exhibit 17)

DUSMs Marcus Malone, Eric McCain and Oscar Torres state the front desk duties were never rotated. (Exhibits 16, 18 and 19, respectively)

DUSM Jimmy Glisson says the front desk duties were never rotated and further, that he felt SDUSM Eversman had some personal animus or contempt toward some District personnel, including Complainant. He believes such an atmosphere prompted another female deputy to transfer in order to maintain some work-related quality of life. (Exhibit 11)

*Management Testimony*

**SDUSM Eversman** states that all of the deputies, with the exception of those assigned to the Task Force, worked the administrative functions upon Ms. Leon's departure. He says CDUSM Lewis assigned him the additional duty of supervisor of administrative personnel for almost a year during this period. He explains he requested SDUSM Guida assign operational deputies to assist when the workload started to buildup, and SDUSM Guida complied and assigned an available deputy to the task. SDUSM Eversman states that during these requested times, SDUSM Guida assigned every deputy to perform at one time or another. He maintains he recalled one deputy in particular, DUSM Marcus Malone, complaining about doing it so often that another administrative employee, Denise Perkins, requested he not come back. SDUSM Eversman recalls now retired DUSM Wesley Davis working it often because he was on light duty part of the time, and he recalls DUSM Jimmy Glisson working it very often without any complaint because he was familiar with the process.

SDUSM Eversman says the term "deputary" was actually coined by Complainant in her response to deputies being tasked with "secretarial" duties. He states that he personally heard Complainant refer to herself as a "deputary" several times, but never heard others refer to her as that. (Exhibit 23)

16