# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

LAWANDA HEWITT,

     **Plaintiff,**

v.                             **CASE NO. 1:18cv14-CR**

MATTHEW WHITAKER,[1]
et al.,

     **Defendants.**

_____/

## ORDER[2]

Plaintiff, a Deputy United States Marshal, filed this Title VII employment discrimination suit *pro se* against the Attorney General of the United States ("Attorney General"), United States Marshal Charles Andrews, and Supervisory Deputy United States Marshal Ed Eversman, alleging disparate treatment and a hostile work environment based on her sex. *See* 42 U.S.C. § 2000e-16(c).[3] Pending

---

[1] Jefferson B. Sessions III, the former United States Attorney General, was originally named as a defendant but has since resigned his position. Therefore, the Court substitutes the name of the current Acting Attorney General, Matthew Whitaker, pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to update the docket accordingly.

[2] The undersigned, a district judge in the Northern District of Florida, has been specially assigned to this case and designated by the Chief Judge of the Eleventh Circuit to perform all of the duties of a district judge in the United States District Court for the Southern District of Alabama as necessary to decide this case. ECF No. 6.

[3] Section 2000e-16(c) prohibits discriminatory practices by a federal government employer and permits a federal employee to bring a civil action for redress of grievances within 90 days after the final agency decision. Plaintiff filed a formal charge of sex discrimination and harassment under the Department of Justice's equal employment opportunity regulations on July 20, 2015,

is Defendants' Motion to Dismiss the Complaint for failure to state a claim and for failure to exhaust administrative remedies, ECF No. 14. Because evidence outside the Complaint was attached to the motion to dismiss, the Court gave notice that the summary judgment procedures of Rule 56 would apply. *See* S.D. Ala. Loc. R. 56. Plaintiff was given additional time to respond, and, like Defendants, Plaintiff also submitted evidence outside the pleadings.[4] Now, having fully reviewed the matter and viewing the record and reasonable inferences in the light most favorable to Hewitt, the Court finds that the motion is due to be granted.

## I. Background

Plaintiff Lawanda Hewitt is presently employed as a Deputy United States Marshal for the United States Marshals Service, assigned to the Southern District of Alabama's Mobile office. At the time of the events alleged, she was the only woman deputy in the Mobile office. She complains she suffered sex discrimination and a hostile work environment based on actions taken by the warrants supervisor, Supervisory Deputy United States Marshal Ed Eversman. Hewitt filed an informal

and received a final decision and right to sue letter, dated October 18, 2017. Hewitt timely filed suit within 90 days.

[4] The evidence consists of Hewitt's informal and formal grievance with the United States Marshal's Service, the agency's Equal Employment Opportunity investigation report and final decision, affidavits, email correspondence, and Hewitt's written responses to the informal grievance decision and EEO report of investigation.

CASE NO. 1:18cv14-CR

agency grievance with the United States Marshal's Service on May 12, 2015, and a formal grievance with the its Human Resources Division on May 24, 2015. On June 11, 2015, she requested counseling pursuant to the agency's equal employment opportunity ("EEO") complaint process, and she filed a formal EEO complaint on July 20, 2015, with the United States Marshals Service's Office of Equal Employment Opportunity. The Marshals Service's EEO office commenced an investigation into the following instances of alleged discrimination by Eversman: (1) a communication on April 30, 2015, criticizing the timeliness of Hewitt's actions on a warrant; (2) a job performance evaluation on June 16, 2015; and (3) other allegedly harassing conduct, such as singling out Hewitt by scolding, belittling, and humiliating her in front of co-workers.

Hewitt's EEO claim was denied, and she timely filed this suit, seeking compensatory and equitable relief.[5] In her Complaint, Hewitt alleges the following instances of alleged discrimination and harassment, occurring from 2011 through 2015.

---

[5] Specifically, Hewitt requested equitable relief "to eliminate the effects of Defendants' past and present discrimination," "to prevent such discrimination from continuing to adversely affect her life and career," and to restructure "the assignment selection procedures, training, and other terms and conditions of employment."

1.    Fall 2011 Training at the Range

The first major incident alleged by Hewitt occurred in the fall of 2011, when she and other deputies were attending training at the firing range, and Eversman was conducting CPR training as well.  Eversman advised the deputies by email that the lunch break during the training would be limited to 30 minutes, so they should bring their lunch.[6]  Hewitt made arrangements for herself and three other deputies to have lunch at her sister's house, which was 200 yards from the range, and they returned within 20 minutes.  Eversman singled out Hewitt for leaving during the break and scolded her for disobeying his orders.  He called Hewitt defiant, verbally reprimanded her with an angry tone for ten minutes, and belittled her in front of a co-worker, causing her to cry.  She alleges that none of the other deputies were reprimanded.  When Hewitt complained to her immediate supervisor, Supervisory Deputy United States Marshal Dwayne Guida (now retired), he reviewed Everman's email instructions about the lunch break and expressed an opinion that Hewitt had done nothing wrong. When the incident was brought to the attention of Chief Deputy United States Marshal Marcia Lewis (now retired), she remarked that Eversman

---

[6] Eversman disputes Hewitt's characterization of the incident.  He claims he told the deputies they were not authorized to leave the range during lunch.

cannot order people where to eat lunch and ensured that all deputies who had stayed as instructed received 30 minutes of overtime pay.

### 2.    Spring 2013 Missed Call

Another incident occurred in the spring of 2013.  Hewitt was off duty on a weekend and noticed she had missed a call from the work answering service.  She immediately called her supervisor, Eversman, who screamed and yelled at her for ten minutes on the phone and threatened to write her up for not calling back sooner. Hewitt learned that Eversman did not speak with the same tone but had been calm and polite when he reprimanded the male deputy who had been the deputy on duty that weekend who, like Hewitt, had also missed the call.  Hewitt notified Supervisor Guida of Eversman's conduct, saying she felt that he had treated her like his teenage daughter.  Chief Lewis, who was also informed of the incident, said she would "handle Ed."  A few days later, Criminal Clerk Denise Perkins told Hewitt that she had overheard Eversman laughing about how Chief Lewis had ordered him not to speak to Hewitt anymore.

### 3.    Spring 2013 Warrant & Performance Rating

Another missed call incident occurred in the spring of 2013.  Hewitt had learned that a fugitive who was the subject of a warrant she was working had been taken into custody by the Fairhope, Alabama, Police Department, and she thus began

CASE NO.  1:18cv14-CR

making arrangements to have the subject transferred to Mobile, Alabama, when she missed a call from Eversman. She returned the call as soon as she noticed it and learned he had been calling to inform her that the suspect was in custody, although she was aware of this fact and had been working on the case. Eversman scolded her for not returning his call immediately. A few months later, Hewitt's annual performance evaluation reflected a score of "3" (Successful) in the category of Investigations, which she considered unfair, particularly given that she received ratings of "4" (Excellent) or "5" (Outstanding) in all other categories. Hewitt questioned the Investigations score because she has 17 years of investigative experience, but when she complained to Guida, he told her that Eversman, as the warrants supervisor, had the responsibility for evaluating and rating deputy performance on investigations. Guida told Hewitt not to take it personally, saying, "Ed has a problem with females. Before you, it was Nicole. Before Nicole, it was Robyn." ECF No. 1, at 5 (Complaint).

4.     Winter 2013 Task Force Team Leader Tryouts

Hewitt also alleges that during the winter of 2013, there were team leader tryouts for the United States Marshals Service Fugitive Task Force. Applicants were given a detailed description of the grading system, which consisted of five categories (their annual evaluation, a fitness test, shooting proficiency, a sample written report,

and an interview). Hewitt was sick with the flu and unable to participate in the tryouts that winter, and Deputy Dickerson (male) had been selected by the time she returned to work. Hewitt heard that Eversman had decided to give "extra credit" for push-ups on the physical fitness portion of the exam, and she complained to Chief Lewis that this showed a bias toward the men. Hewitt states that Chief Lewis was "upset about the extra-credit push-ups" but assured Hewitt that this was not the deciding factor. Hewitt admits that she could not have participated in 2013 due to her illness and also because the selection was over by the time she returned to work. When team leader tryouts were held the following year, in September 2014, Hewitt asked whether there would be extra credit for push-ups, again voicing concern about the tryouts being biased toward men, and Eversman replied with a "scathing email," saying her complaint of bias did not "hold water" because she had not competed in the 2013 tryouts.[7]

###### 5.    January 2014 Timeliness of Warrant

During January 2014, Eversman confronted Hewitt about the length of time it was taking her to act on a particular warrant. According to Hewitt, she had worked the warrant only for four days because she had been on vacation and because

---

[7] The record does not reflect whether Hewitt participated in the task force leader tryouts any other year.

CASE NO.  1:18cv14-CR

freezing weather and ice had closed most businesses, including the courthouse, for a few days.  Hewitt stated that in light of these circumstances, Eversman's criticism of her for not working more on the warrant showed discriminatory treatment because he did not supervise the male deputies so closely.  Again, she felt unfairly singled out because she was female.  Hewitt complained of this confrontation to Guida, who minimized the incident, telling her, "that's just Ed being Ed."

### 6.    Fugitive Roundups

Hewitt states that during her seven years of employment, there had been three "fugitive roundups" but she had not been allowed to participate in any of them.  She stated that Eversman and Guida were responsible for assigning deputies to work in the round-ups and that these opportunities are important for career advancement.[8]

### 7.    Administrative Desk Duty

Hewitt's Complaint also includes allegations that she was denied career opportunities in part because she was required to sit at the front desk during a time when the criminal clerk had been relieved of her duties.  Hewitt was told that all

---

[8] Hewitt does not allege how deputies are selected for roundups.  Her allegation suggests that she intended to take leave time instead of participating in at least one of the roundups.  The Final Agency Decision ("FAD") noted that Eversman said other agencies controlled the roundups, that participation was voluntary, that Guida was in charge of lining up the necessary volunteers for the roundups, and that Hewitt "rarely" volunteered.  FAD, ECF No. 14-2, at 12-13.

CASE NO.  1:18cv14-CR

deputies would be required to take a 30-day rotation to cover the desk work, but she says she was the only one required to do so.[9]  Consequently, others referred to her as the "deputary."  Another deputy, William McAdam, knew of no male deputies assigned to the front desk to perform clerical duties and he said the term "deputary" was used to describe a deputy who is required to perform clerical duties instead of law enforcement duties.

8.    Treatment of Other Females

Hewitt alleges that Eversman has treated other females less favorably as well. Deputy Marshal Nicole Dugan, who worked in the Mobile office from 2007 through 2011, stated by affidavit that she felt singled out for job performance issues and was denied opportunities because she was female.  She said she was denied an opportunity to attend special operations training when Eversman told her that she could not sign up because "you're a girl." ECF No. 16, at 40.  Denise Perkins, a Criminal Program Specialist in the Mobile office at the time, stated she was bullied by Eversman, who once made a gloating remark after she had been reprimanded by

---

[9] Hewitt also alleges in the Complaint that the following year, when she was placed on light duty due to an injury, Guida told her she would be placed at the front desk again, but he relented and did not require her to sit at the desk after she complained that male deputies on light duty were not required to work up front.

CASE NO.  1:18cv14-CR

a supervisor, stating, "Awww, did you get your pee pee slapped?"[10]  ECF No. 16, at

46.  Perkins stated in her affidavit that Eversman was prone to "sudden outbursts"

and "tyrannical behavior."  ECF No. 16, at 45.  Additionally, Court Security Officer

Connie King provided an affidavit stating that she was bullied and intimidated by

Eversman.  In her affidavit, she recounted an incident with Eversman after Hewitt

had filed a grievance. King stated that Eversman confronted her in a parking garage

on May 21, 2015, after learning of Hewitt's grievance against him.  He warned King

that any animosity he might show her in the future would depend on how she

answered his questions, and he then asked whether she had helped Hewitt draft an

EEO complaint, among other things. She stated that Eversman was agitated and

spoke in a manner that made her uncomfortable.[11]

### 9.    Email, April 30, 2015, on Timeliness and Warrant Checklist

In April 2015, Eversman confronted Hewitt again about her progress on a

warrant investigation.  Hewitt admits she had not made much progress, having been

---

[10] In her affidavit, Perkins stated that, although this type of conduct was typical of Eversman, it was ignored by Chief Lewis and Guida.

[11] In his affidavit, Eversman provided a different account of his conversation with King. He said this occurred a few days after he gave Hewitt the investigations checklist on April 29, 2015, not after she had filed a grievance.  He said he had heard that Hewitt was discussing the checklist with other deputies, and he wanted to know whether she had discussed this internal matter with King, who was a Court Security Officer.  He felt the conversation was cordial.

CASE NO.  1:18cv14-CR

busy dealing with other matters, including a property inventory, the transfer of two deputies, and another deputy's funeral. Eversman called her into his office and went over a checklist, asking her which tasks she had completed and scolding her for lack of investigative actions over a period of four weeks. Hewitt felt that Eversman's criticism of her job performance was unjustified and she complained to Guida, who recognized that Hewitt had been extremely busy and asked Eversman not to hold this against her. Three weeks later, on April 29, 2015, Hewitt received another "scathing email" from Eversman with a checklist to complete and deadlines for completion of the required tasks.[12] On April 30, Eversman assigned Hewitt a new warrant and sent her an email requiring her to follow a detailed checklist of tasks and to report her findings and activities to him in person by May 6. He had been advised to provide Hewitt a checklist to follow by Chief Deputy Marshal Vernon Johnson, who took over after Chief Lewis retired. Again, Hewitt felt she had been singled out for different treatment than her male deputy counterparts. She showed the email to her direct supervisor, who commented, "why is he singling you out?"

---

[12] The email text is referenced in Eversman's affidavit. In the email, he noted that he had spoken with Hewitt previously about her lack of investigative effort, that he had reviewed the file of a current investigation and found that no entries had been logged and only one check had been run, and he provided specific directions for her to accomplish the tasks he identified, with a deadline for completion the following day. He warned that the failure to follow instructions would result in "further disciplinary actions." ECF No. 14-3, at 18.

CASE NO. 1:18cv14-CR

and to other deputies, who commented that Eversman does not micromanage their work in this way.  After showing the email to others, co-workers advised Hewitt to file a grievance, offering the opinion that Eversman obviously had "personal issues" with her.

          10.    <u>Performance Rating, June 16, 2015</u>

On June 16, 2015, Hewitt again received a "3" (Successful) performance rating from Eversman in the "Investigations" category of her annual performance evaluation, but despite this lower rating, Hewitt received an overall performance rating of "4" (Excellent).[13]  Eversman provided comments with his review, including that Hewitt did not complete warrants in a timely manner, that she did the minimum amount of effort to complete assigned investigations, and that she would benefit from implementing better time management skills.  Hewitt disagreed with his assessment.  Hewitt notes that in the separate category of "Time Management," scored by Guida, she received a "4" (Excellent), and also references a spreadsheet created by Eversman himself, showing the dates that warrants were assigned and closed.  According to Hewitt, this confirms that she closed warrants faster than any

---

[13] The performance evaluation included eight categories.  In addition to receiving a "3" for Investigations, which was the only category scored by Eversman, Hewitt received several ratings of "5" (Outstanding), and a "4" (Excellent).

CASE NO.  1:18cv14-CR

other deputy in her office and had the least number of warrants outstanding for over 30 days.[14] Eversman explained by affidavit that Hewitt's warrants were subject to scrutiny for timeliness because she was assigned Class 1 warrants, which required the reporting of statistics.[15] According to Eversman, Hewitt always had some excuse for why she had not completed an investigation, and he commented that her work showed a repeated lack of attention to timeliness.

Hewitt alleges that several weeks later, the deputies received cash awards based on their annual performance evaluations and that she received a lesser cash award than the male deputies who, like her, had received an overall rating of Excellent. Documentary evidence shows that four Deputy Marshals (3 males, 1 female) received an overall score of Excellent—the three males received a cash award of $1,450 whereas Hewitt received a lesser cash award of $875.[16] ECF No.

---

[14] In his affidavit during the EEO investigation, Eversman stated that his spreadsheet was not a performance evaluation tool but a basic chart created to allow others to see what cases were active and which Deputy United States Marshal was assigned to each warrant, when Eversman was out of the office. Eversman said the spreadsheet had no data about the case, the investigative efforts or methods of the deputy, or reasons the cases closed. *See* ECF No. 14-3, at 4-9. He also noted that Hewitt never came to him to discuss her rating.

[15] Eversman also stated that Task Force Supervisor, Henry Geberth, had requested that Hewitt not be allowed to remain on the Task Force for another rotation, which Hewitt disputed as a fabrication in her response to the EEO investigation. She stated she never had any issues working with Chief Geberth.

[16] The chart shows only that each deputy received an "E" rating overall. It does not show their ratings in any particular category or comments on their performance. The record shows that

14-4.   The record shows that Hewitt received a "3" (Successful) rating from Eversman on investigations for 2013, 2014, and 2015 and that she was never rated below "Excellent" overall on her annual performance evaluation.

11.   <u>Singled out for humiliation</u>

Hewitt also alleges that Eversman singled her out on multiple occasions for scolding.   She said he belittled and humiliated her in front of co-workers and imposed unrealistic job expectations for her that were not required of the male deputies.   Hewitt stated in her affidavit that Eversman was a bully in the workplace and that his hostile conduct toward her has interfered with her ability to perform her job.   Hewitt also alleges in the Complaint that discrimination was so blatant that there was a running joke in the office of saying, "Lawanda, you're just a girl!"  ECF No. 1, at 2.

In addition, Hewitt states in her Complaint that, during the EEO investigation, she had been working what was to be an 18-month rotation on the Task Force, finishing out another deputy's term, who had been promoted and transferred.   The term began December 1, 2015, and Hewitt contends that she was "pulled from the Task Force back to court operations again with no explanation" after seven months,

---

Hewitt received a cash award each year (2013 through 2015) and the exhibits reflect that deputies did not receive uniform cash awards for an overall "E" rating.

before she completed the 18-month rotation.  ECF No. 1, at 9.  According to Hewitt,

the timing of this "suspiciously" coincided with the EEO investigator completing his

investigation into her formal EEO complaint.

## II.    Legal Standards

A complaint must "include sufficient factual matter, accepted as true, to 'state

a claim of relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)), and if it does

not, it is subject to dismissal.[17]  *See* Fed. R. Civ. P. 12(b)(6).  Courts must generally

convert a motion to dismiss into a summary judgment motion, however, if matters

outside the complaint are considered.  *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,

600 F.3d 1334, 1337 (11th Cir. 2010).  An exception to this rule allows courts to

consider a document attached to the complaint or submitted with the motion dismiss

without converting it into a summary judgment motion if the document is central to

---

[17] Federal pleading rules require only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not detailed allegations.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  However, to survive a motion to dismiss for failure to state a claim, a complaint must "include sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  The "plausibility standard" requires a showing of "more than a sheer possibility" that the defendant is liable on the claim.  *Iqbal*, 665 U.S. at 678.  The plaintiff must show enough factual grounds to raise the asserted right to relief above the level of speculation, but legal conclusions are not accepted as true.  *See id*.; *Twombly*, 550 U.S. at 555. This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

the complaint and its authenticity is not in dispute. *See id.*; *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). As noted above, because Defendants submitted evidence outside the Complaint consisting of affidavits and other matters from the EEO investigation, the Court gave notice that the pending motion would be considered under summary judgment procedures of Rule 56, pursuant to local rule. *See* S.D. Ala. Loc. R. 56. Plaintiff was given additional time to respond and likewise presented evidence outside the Complaint.

Under Rule 56, courts may grant summary judgment if, viewing the evidence in the light most favorable to the nonmovant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the grounds and factual support for the motion and is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of her case on which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). For the limited purpose of this summary judgment proceeding, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is the Plaintiff. *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted). A litigant's own self-serving statement can defeat summary judgment if it

CASE NO. 1:18cv14-CR

is based on personal knowledge and is not conclusory in nature. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (non-conclusory self-serving sworn statements are not to be disregarded at the summary judgment stage). On the other hand, "[s]peculation does not create a *genuine* issue of fact." *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (quoting *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)). Courts may not make credibility determinations when reviewing a summary judgment record or weigh conflicting evidence because these are functions properly left to a jury. *See Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001); *Cottrell v. Caldwell,* 85 F.3d 1480, 1486 (11th Cir. 1996) (what are "considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial").

## III. Discussion

### A. Individual Liability

Initially, the individual Defendants Charles Andrews and Ed Eversman argue for dismissal of Hewitt's claims against them because there is no individual liability under Title VII. The Court agrees. Title VII grants relief against an employer, which in this case is the federal agency, "not [against] individual employees whose actions would constitute a violation of the Act." *Hinson v. Clinch Cty., Ga. Bd. of Educ.*,

231 F.3d 821, 827 (11th Cir. 2000) (quoting *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)).  A federal employee's Title VII employment discrimination claim is proper only against the head of an agency in his official capacity.  *See Glover v. Donahoe*, 626 F. App'x 926, 931 (11th Cir. 2015) (unpublished)[18] (citing *Canino v. United States EEOC*, 707 F.2d 468, 472 (11th Cir. 1983)) *see also* 42 U.S.C. § 2000e-16(c) (stating in a civil enforcement action by a federal employee, "the head of the department, agency, or unit, as appropriate, shall be the defendant").  In this case, Hewitt has appropriately named the head of the Department of Justice, the Attorney General, as Defendant.  Because the head of the agency is the proper party and there is no individual liability under Title VII, the other named defendants, Charles Andrews and Ed Eversman, are therefore due to be dismissed.

## B.     Exhaustion of Administrative Remedies

The Attorney General argues that all incidents of alleged discriminatory treatment that occurred more than 45 days before Hewitt sought EEO counseling on June 11, 2015, are barred due to Hewitt's failure to exhaust.[19]  Because Hewitt is a

---

[18] While unpublished opinions are not considered binding, they may be considered as persuasive authority.  *See* 11th Cir. R. 36-2; *see also United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000).

[19] The Attorney General argues that the Court lacks jurisdiction.  There are cases describing the requirement to file an administrative complaint in jurisdictional terms.  *See Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999) ("A federal employee must pursue and exhaust her administrative remedies as a jurisdictional prerequisite to filing a Title VII action."); *see also*

federal employee, she was required to exhaust her administrative remedies by contacting the agency's EEO counselor within 45 days of the alleged discrimination to begin an administrative review. *See* 29 C.F.R. § 1614.105(a)(1); *see also Shiver*, 549 F.3d at 1344 (citing 42 U.S.C. § 2000e-16; 29 C.F.R. § 1614.105(a)(1)). Generally, if the employee does not initiate this process within 45 days of an unlawful practice, the claim is barred for a failure to exhaust administrative remedies, absent a waiver or exception. *See Shiver*, 549 F.3d at 1344; *Brown v. Snow*, 440 F.3d 1259, 1264-65 (11th Cir. 2006). Each discreet "incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice" and "starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101,

---

*Brown v. Snow*, 440 F.3d 1259, 1264 (11th Cir. 2006) (noting although other circuits have reasoned that administrative exhaustion is not jurisdictional, "our precedents say otherwise"). However, it is clear from other holdings of the Eleventh Circuit and the Supreme Court that the *timeliness* of the administrative filing is a condition precedent to suit, subject to waiver, not a jurisdictional matter. *Milam v. U.S. Postal Serv.*, 674 F.2d 860, 862 (11th Cir. 1982); *see also Zipes v. Indep. Fed'n. of Flight Attendants*, 455 U.S. 385, 393 (1982) ("We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."). In this instance, there is no question that Hewitt satisfied the prerequisite of filing an administrative complaint before bringing suit against her federal employer. The only issue is whether she satisfied that prerequisite in a timely manner for each act of discrimination she asserts for purposes of stating a claim. The Court has jurisdiction.

CASE NO. 1:18cv14-CR

113-15 (2002). Thus, discrete acts of discrimination occurring prior to a plaintiff's 45-day filing window are untimely and not actionable.

Although exhaustion is a prerequisite to suit, the administrative charge is not strictly interpreted; instead, the judicial complaint is limited by the scope of the investigation "that can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal marks omitted). In other words, the allegations of the complaint must be "reasonably related" to the EEO charge with no "material differences" between the two. *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989). Regarding new discrete acts of discrimination that occur *after* an EEO complaint is filed, they also "must first be reviewed administratively" before they can serve as the basis for a judicial claim of discrimination. *Ray v. Freeman*, 626 F.2d 439, 442 (5th Cir. 1980)[20] (finding subsequent acts were not exhausted where the claimant failed to amend her EEO complaint). Notwithstanding, allegations of subsequent acts may be included in a judicial complaint if they are "reasonably related to charges in the administrative filing" or merely "amplify, clarify, or more clearly focus earlier EEO

---

[20] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting the case law of the former Fifth Circuit developed before October 1, 1981, as precedent in this Circuit).

complaints." *Id.* at 443; *see also Baker v. Buckeye Cellulose Corp*., 856 F.2d 167, 169 (11th Cir. 1988) (holding a claim for retaliation could reasonably be expected to grow out of an original charge of discrimination and need not be separately exhausted) (citing *Gupta v. E. Tex. State Univ*., 654 F.2d 411, 414 (5th Cir. Aug. 28, 1981)).

Hostile environment claims involve repeated conduct and therefore are treated differently for exhaustion purposes. *Morgan,* 536 U.S at 115 (noting hostile environment claims are different in nature from discrete acts because a hostile environment "occurs over a series of days or perhaps years"). All acts constituting a hostile environment claim may be considered to prove liability even if some contributing acts occurred outside the filing period, as long as at least one "act contributing to the claim occurs within the filing period." *Id.* at 117; *see also Hipp v. Liberty Nat'l Life Ins. Co*., 252 F.3d 1208, 1221 (11th Cir. 2001) ("continuing violation" doctrine permits a plaintiff to pursue an otherwise time-barred claim where at least one other violation occurred within the statutory period). Similarly, subsequent events may also be considered within the scope of the EEO complaint if they are part of one continuing hostile work environment claim. *Morgan,* 536 U.S at 117.

CASE NO. 1:18cv14-CR

In this case, it is undisputed that Hewitt did not initiate the administrative process by requesting EEO counseling until June 11, 2015. Calculating the 45-day filing window leads to the conclusion that Hewitt is barred from proceeding on any discrete act of discrimination prior to April 27, 2015, due to her failure to exhaust administrative remedies. However, although incidents preceding April 27, 2015, are not independently actionable as discrete acts of discrimination, they could be considered as part of a continuing hostile work environment, which is discussed further below. *See Morgan,* 536 U.S. at 122.

## C.    Disparate Treatment

Title VII requires that "all personnel actions affecting [federal] employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a); *see also id.* § 2000e-16(c) (providing that a federal employee may bring a civil action for employment discrimination, as provided in § 2000e-5). Absent direct evidence of discrimination, a plaintiff can prove discrimination by circumstantial evidence using the familiar *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff raises an inference of discrimination by establishing a *prima facie* case, showing (1) that the plaintiff is in a protected class, (2) was qualified for the job, (3) suffered an adverse employment

action, and (4) that the employer treated similarly situated employees outside the protected class more favorably. *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Once this *prima facie* showing is made, it "creates a rebuttable presumption" of unlawful discrimination, requiring the employer to provide a legitimate, nondiscriminatory reason for treating the employees differently. *EEOC v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1272 (11th Cir. 2002). If the employer meets this burden, then the plaintiff must show with greater specificity that the reason offered to justify the differential treatment was merely a pretext for unlawful discrimination. *See id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981)); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (requiring a showing that the reasons given are false and that discrimination was the real reason for the adverse action). A plaintiff can also survive summary judgment by showing the existence of a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011).

Regardless of which analytical framework applies, proof of an "adverse employment action is an indispensable element of a Title VII" *prima facie* case of discrimination. *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1246 (11th Cir. 2001) (noting also that summary judgment is appropriate if the plaintiff fails to

CASE NO. 1:18cv14-CR

satisfy any element of the *prima facie* case). An adverse action must be a tangible employment action amounting to a material or "*significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a significant change in benefits."[21] *Id.* at 1239 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760-61 (1998) alteration in original). Negative performance reviews or job criticism, even if unjust or discriminatory, without more, are not significantly adverse to be actionable. *See id.* at 1242. Importantly, "courts do not sit as a super-personnel department that reexamines an entity's business decisions."[22] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotations omitted).

The Attorney General argues that Hewitt's exhausted discrimination claims, *i.e.*, the critical comments by Eversman in an email to Hewitt dated April 30, 2015,

---

[21] As Hewitt argues and as discussed *infra,* hostile work environment claims under Title VII are different in scope and not limited to economic or tangible discrimination, and hostile work environment claims cover more than the "terms" and "conditions" of employment in a contractual sense. *See Morgan*, 536 U.S. at 115-16.

[22] In evaluating the conduct of an employer under Title VII, the Court is mindful that Title VII does not provide federal courts with grounds to "second-guess non-discriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges." *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)). The Eleventh Circuit has "repeatedly and emphatically held" that an employer is free to terminate employees for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.* (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)).

and his evaluation of her job performance on June 16, 2015, fail as a matter of law because, on this record, Hewitt has not established an adverse employment action. Hewitt argues in response that she has suffered adverse actions and also that Eversman's criticisms of her timeliness in working warrants were false because she in fact had the best warrant clearance rate out of all the deputies, according to his own spreadsheet, and her direct supervisor, Guida, rated her as "Excellent" in the category of Time Management. The Court agrees with the Attorney General that, even assuming Eversman was wrong for criticizing Hewitt's timeliness, Hewitt cannot establish a *prima facie* case of discrimination in the absence of a tangible adverse employment action, which is not shown on this record.

Turning first to Eversman's email dated April 30, 2015, criticizing Hewitt's timeliness in working on assigned warrants and requiring her to complete certain listed tasks by the following day, the Court notes that no discipline, significant additional duties or excessive supervision was imposed. The Eleventh Circuit has stated that "courts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Davis*, 245 F.3d at 1241. Hewitt claims that the email was "threatening" and that Eversman did not micromanage the warrant

investigations of male deputies this way. The only threat in the email, however, was that she *could* face discipline if she did not complete the tasks as required, and she was required to do no more than document the ordinary tasks necessary to the investigation on a particular warrant assignment. This type of employer feedback and criticism "is an ordinary and appropriate feature of the workplace," even if it is unjustified on the merits. *Davis*, 245 F.3d at 1242 (also noting that "unwarranted job criticism or performance review will rarely—without more—establish the adverse action necessary to pursue a [Title VII discrimination] claim"). Also, subsequent to this email, Eversman rated Hewitt's performance on investigations as "Successful," despite his criticism of her timeliness, confirming that the email did not amount to a "*serious and material* change in the terms, conditions, or privileges of employment" as viewed by a reasonable person. *See id.* at 1239 (quoting *Ellerth*, 524 U.S. at 761); *see also Tarmas v. Sec'y of Navy*, 433 F. App'x 754, 763 (11th Cir. 2011) (unpublished) (finding an email citing poor job performance was not materially adverse, especially where the employee received an "acceptable performance review"). Even assuming the male deputies were not "micromanaged" in this way, neither this email nor the required checklist materially increased Hewitt's workload or duties or otherwise altered the terms or conditions of her employment.

CASE NO. 1:18cv14-CR

Hewitt also argues she suffered a tangible adverse employment action when she received a lesser cash bonus because of Eversman's lower rating of her performance on investigations.[23] The Eleventh Circuit has concluded that "[a] lower score on [a federal employee's] performance evaluation, by itself, is not actionable under Title VII unless [the employee] can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities." *Brown*, 440 F.3d at 1265-66 (citing *Davis*, 245 F.3d at 1241) (noting also that the employee's "downgraded evaluation still described [his] performance as fully successful"). Courts have recognized that the denial of a bonus may be considered an adverse action but only if there is evidence that the plaintiff was "disentitled to a bonus because of a rating" received and otherwise "would have been guaranteed a bonus" with a higher rating. *See e.g., Cain v. Geren*, 261 F. App'x. 215, 217 (11th Cir. 2008) (unpublished) (finding evidence of plaintiff's conclusory and self-serving assertion that she would have received a bonus with a higher rating was insufficient

---

[23] Hewitt maintains she also suffered adverse actions by being denied career advancement opportunities because she was not chosen to participate in fugitive roundups and was required to sit at the front desk. Even if the these could be considered sufficiently adverse employment actions, they resulted from discrete acts of alleged discrimination that occurred prior to Hewitt's 45-day filing window and thus are barred from consideration as incidents of discriminatory treatment due to Hewitt's failure to timely exhaust her administrative remedies regarding them.

to establish adverse action[24]) (citing *Brown*, 440 F.3d at 1265); *Hargett v. Fla. Atl. Univ. Bd. of Trustees*, 219 F. Supp. 3d 1227, 1240 (S.D. Fla. 2016) (finding no materially adverse action where the connection between the performance review and annual bonuses was supported by nothing more than self-serving conclusory allegations an no evidence that the plaintiff received a bonus for years she had a more positive review and was denied one when she received a negative review); *Odom v. Holder*, No. 2:11-CV-3086-SLB, 2014 WL 1233709, at *21 (N.D. Ala. Mar. 25, 2014) (finding a rating of "Excellent" as opposed to an "Outstanding" was "a trivial difference" that would not dissuade a reasonable employee in Odom's position from engaging in protected activity" because there was no expectation or entitlement to a "quality step increase" award even with an "Outstanding" rating).

Hewitt presented evidence that male deputies who received the same overall performance rating as she did (Excellent) in 2015, which is the second highest rating, were given a larger cash award than she received—three male deputies received $1,450, and Hewitt received $875. In the evaluation, Eversman had rated Hewitt as

---

[24] The Court notes that a retaliation claim was at issue in *Cain v. Geren*, not a disparate treatment claim as here, but this distinction makes no difference to the analysis in this case. A *prima facie* case of retaliation covers an even broader range of conduct than a case of discriminatory treatment. *See generally Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006). It is therefore instructive that the performance rating and denial of a bonus in *Cain* were not considered sufficiently adverse to make out a *prima facie* case.

"Successful" in Investigations and commented that she was doing "the minimum amount of effort to complete her assigned investigations in a successful manner" and was not timely. This was one category out of eight on the evaluation, and Hewitt nevertheless received an overall performance rating of "Excellent" and a cash award. Hewitt was not fired, demoted, or denied a pay increase, nor was she disqualified from receiving a promotion or even a cash award bonus because of the "Successful" rating in one category (which she in fact received).

According to the United States Marshals Service Policy Directives, the cash awards are discretionary, given on an individual basis, and designed "to recognize and reward employees who perform in an exemplary manner." ECF No. 16-1, at 321. There is no evidence that Hewitt would have been guaranteed a higher cash award if Eversman had rated her higher on Investigations. In fact, the record shows that for the two prior years, he had also rated her 3 "Successful" in Investigations and similar to 2015, she had received a cash award but there were other deputies with the same overall rating as she who had received more money despite having the same overall rating.[25] In 2015, cash awards were given to four deputies, including

---

[25] For instance, for the performance year of July 2012 through June 2013, nine deputies ranked "E" overall were given bonuses in varying amounts, ranging from $800 to $1,599 (Hewitt and four others received $800). The next year, six deputies rated "E" overall, and the amount of the awards varied from $600 to $650 (Hewitt and three others received $600).

CASE NO. 1:18cv14-CR

Hewitt, who rated "E" overall, and four other deputies who also rated "E" overall received time off awards.[26] On these facts, the lesser discretionary cash award that Hewitt received (which was higher than she received other years) cannot be characterized as sufficiently adverse to be a "*significant* change in benefits," *Davis,* 245 F.3d at 1239 (quoting *Ellerth*, 524 U.S. at 760-61). She was not entitled to a cash award at all, and certainly not in any particular amount.[27] On this record, Hewitt cannot establish a *prima facie* case of discrimination, and the Attorney General is entitled to summary judgment on her discrimination claims.[28]

---

[26] An employee listing shows there were ten United States Deputy Marshals at Hewitt's pay grade as of October 2014, four of whom received cash awards, including Hewitt.

[27] Even if the receipt of a smaller cash award than others who received the same overall performance ranking could be considered a tangible adverse action, Hewitt cannot make out a *prima facie* case of discrimination under the *McDonnell Douglas* framework because she has not identified an adequate comparator. The award documents do not show the pay grade of each deputy or their scores on individual categories within the performance evaluation, which could justify a greater cash award. To be similarly situated, a comparator's conduct must be "'nearly identical' to prevent judges from second-guessing employers' reasonable decisions." *Burke–Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006).

[28] Hewitt also argues in opposition to the motion that the lesser cash award is evidence of retaliation. She notes that Eversman was aware of her grievance when he performed her annual review and that the cash award was given after she had filed her EEO complaint. She also states that she was pulled back to court services from the task force before her rotation was done (after seven months on the task force) and that this was "suspiciously" around that time that the EEO investigation was completed. Hewitt did not include a claim of retaliation in her Complaint, however. Also, leave to amend to add a claim of retaliation is futile because neither the lesser cash award nor the change in her work assignment is sufficiently adverse to state a claim. *See Cain*, 261 F. App'x. at 217 (finding evidence of plaintiff's conclusory and self-serving assertion that she would have received a bonus if she'd been given a higher performance rating was insufficient to establish adverse action, even on a claim of retaliation).

### D.    Hostile Work Environment

Hewitt also claims that she suffered a hostile work environment based on her sex because Eversman frequently singled her out unfairly for criticism and belittled and humiliated her in front of co-workers.  Hewitt relies on several incidents detailed above, dating back to 2011, as examples of an abusive working environment.  The Attorney General argues that these prior incidents amount only to discrete acts that do not create a cumulative hostile environment and also that the circumstances described do not rise to the level of severity and pervasiveness necessary to establish a claim of hostile work environment.  The Court agrees.  Even considering all of the incidents alleged, most of which are isolated, the evidence of scolding or humiliating conduct Hewitt endured fails to rise to the level of severity or pervasiveness required to establish a hostile work environment based on sex.

To establish a hostile work environment claim, a plaintiff must (1) belong to a protected class, (2) produce evidence of unwelcome harassment (3) based on the protected characteristic (4) that was severe or pervasive enough to alter the terms and conditions of employment, and (5) that the employer is responsible for the environment.  *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).   The fourth element requires the conduct to be objectively and subjectively hostile or abusive, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d

CASE NO.  1:18cv14-CR

798, 809 (11th Cir. 2010) (*en banc*) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)), showing a workplace so "permeated with discriminatory intimidation, ridicule, and insult," to the extent that it so severe or pervasive as to "alter the conditions of the victim's employment and create an abusive working environment." *Rojas v. Fla.*, 285 F.3d 1339, 1344 (11th Cir. 2002) (quoting *Harris*, 510 U.S. at 21). Objective severity is viewed "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Reeves*, 594 F.3d at 809 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). Factors include "the frequency and severity of the conduct, whether it is physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." *Rojas*, 285 F.3d at 1344 (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997)). It is by now axiomatic that Title VII is not a "general civility code," and conduct amounting to "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)" are insufficient to constitute a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Hewitt complains that she was unfairly singled out, scolded and yelled at, and belittled for violating Eversman's instructions at the training incident in 2011, for missing telephone calls on two instances in 2013, and for various job performance

issues from 2013 through 2015. Hewitt states that the alleged harassment has been subjectively severe and pervasive, causing her stress and making it difficult for her to do her job. This may be true; objectively, however, the incidents and allegations of abusive "verbal beat downs,"[29] while understandably unpleasant, do not demonstrate a workplace "permeated with discriminatory intimidation, ridicule, and insult" based on her sex. *Rojas*, 285 F.3d at 1344.

There are no allegations of Eversman using derogatory names or sex-based insults directed towards Hewitt. The running joke about her being "just a girl" is not attributed to anyone in particular, and there is no indication as to how frequently the remark was made. While she may have been the only one required to sit at the front desk during the criminal clerk's absence, this was a temporary assignment. The term "deputary," while demeaning for a Deputy United States Marshal, is not a sex-based derogatory term and does not suggest that she was subject to ridicule based on her sex. Although Hewitt complains of "scathing emails" from Eversman, no derogatory language is used in them and they were directed at work performance issues.

---

[29] In her response to the motion, Hewitt argues that Eversman's harassment was not confined to isolated incidents but also consisted of "constant and repeated slurs [and] derogatory comments." ECF No. 16, at 18. This argument is conclusory and without record support. There is no evidence of Eversman directing slurs and derogatory comments at Hewitt, much less "repeated slurs and derogatory comments" that were sexual in nature.

Hewitt was told by supervisor Guida that Eversman had a problem with women, and he gave examples of other women who worked there before Hewitt. But the fact that Eversman may have made derogatory or abusive comments to other women is immaterial without evidence that Hewitt was aware of them at the time. *See Adams v. Austal, USA, LLC*, 754 F.3d 1240, 1250 (11th Cir. 2014) ("The totality of a plaintiff's workplace circumstances does not include other employees' experiences of which the plaintiff is unaware."). This is the case with Dugan, who did not work in the Mobile office at the same time as Hewitt; Hewitt heard about Dugan's problems with Eversman only after the fact, so her complaints have little bearing on whether Hewitt's working environment was abusive.[30] *See id.* Although Perkins and King did work for the Marshals Service in Mobile while Hewitt was there, the only overtly sexual reference asserted is Eversman's comment to Perkins about getting her "pee pee slapped," and it is unclear whether Hewitt knew of this when it occurred. No other sex-based comments are referenced. Perkins's statement admits that Eversman said he thought Hewitt did not put the time and effort into working warrants as others did, and she felt his treatment of Hewitt was "personally

---

[30] Dugan stated that Hewitt approached her in 2015 to ask about how she had been treated when she had worked in the office from 2007 through 2011. Hewitt contends they were friends, but there is no assertion that Hewitt worked as a Deputy United States Marshal in the Mobile Marshals Service office at the same time as Dugan.

CASE NO. 1:18cv14-CR

driven." ECF No. 16-1, at 140-141. Personal conflicts alone, however, no do not rise to a hostile environment based on sex; the plaintiff must have been "targeted" because of her gender. *See generally, Succar v. Dade Cty. Sch. Bd.,* 229 F.3d 1343, 1345 (11th Cir. 2000) (personal animosity or feuds are not the equivalent of sex discrimination); *Chapman*, 229 F.3d at 1030 (noting courts do not sit as "a super-personnel department").

While the record shows that Hewitt was singled out and may have been wrongly criticized in regards to her job performance, the alleged comments do not rise to the level of severe and pervasive ridicule and insult based on her sex. Title VII does not protect workers against all workplace bullies prone to angry outbursts; it protects against workplace discrimination and harassment based on a protected status that is severe and pervasive. Again, "federal employment laws are not a 'general civility code,' and only harassment severe or pervasive enough to alter the terms of employment will create an actionable hostile work environment." *See Faragher*, 524 U.S. at 789 (citing *Oncale*, 523 U.S. at 80). The undisputed facts, viewed in the light most favorable to Hewitt, do not rise to this level.

Accordingly, Defendant's Motion to Dismiss, ECF No. 14, converted to a motion for summary judgment, is **GRANTED** in favor of Defendant Acting

Attorney General Matthew Whitaker.[31] Defendants Charles Andrews and Ed Eversman are **DISMISSED**. The Clerk is directed to enter judgment accordingly and close the file.

      **DONE AND ORDERED** this 25th day of November 2018.


*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[31] Consistent with Footnote 1, the Clerk is directed to update the docket to reflect that pursuant to Fed. R. Civ. P. 25(d), Acting Attorney General, Matthew Whitaker has been substituted as Defendant in place of Jefferson B. Sessions III, the former United States Attorney General.

CASE NO. 1:18cv14-CR